UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 06 CR 75-13 |
| | ) | Hon. Amy J. St. Eve |
| MATTHEW CITTELL, | ) | |
| Defendant | ) | |
| | ) | |

<u>DEFENDANT MATTHEW CITTELL'S SENTENCING MEMORANDUM</u>

**BACKGROUND**

On June 16, 2008, Matthew Cittell pled guilty to one count of copyright

infringement, in violation of Title 17, United States Code Section 506(a) and

Title 18, United States Code Section 2319(c)(1) [COUNT TWELVE].  In pleading guilty

to a single count of copyright infringement, Cittell has accepted responsibility for the fact

that copyrighted material was unlawfully downloaded onto his computer hard drive with

his knowledge. [1]  Cittell has consistently denied any willful involvement in the RISCISO

conspiracy.  Of the nineteen co-defendants in this case, Cittell was the only one who did

not have a RISCISO "nick"/user name (which was necessary to access RISCISO servers)

---

[1] Of the original co-defendants in this case, fourteen have entered plea agreements.
Twelve pled guilty to the conspiracy count.  In contrast, CITTEL and GREG
PIECYHNA pled only to the infringement count.  Two co-defendants--SEAN PATRICK
O'TOOLE and LINDA WALDRON, both of whom are alleged to have been leaders of
the warez group RISCISO--are still at large.  Three others--SANDY FURY, JASON
DOBYNS and FRED AMAYA--are facing trial.

and, apart from David Lewis,[2] who configured Cittell's computer to download copyrighted material, no member of RISCISO knew Cittell, or was aware that Lewis had configured Cittell's computer to allow it to connect to the RISCISO server.

In the plea agreement, the loss amount attributed to Cittell is set at "approximately $42,000" over a period of twenty-seven months ("between approximately the first quarter of 2003 and June 29, 2005"). Based on that loss amount, the parties agreed to an initial adjusted offense level of 12, with the further agreement that Cittell could request adjustments for minor role and no commercial advantage or private financial gain:

Base Offense Level (U.S.S.G. §2B5.3(a))     8

Infringed Amount (U.S.S.G. §§2B5.3(b)(l)(B) and 2Bl.1(b)(1)(D))

(more than $30,000 but less than $70,000)     +6

Acceptance of Responsibility (U.S.S.G. § 3E1.1)     -2

The Presentence Investigation Report (PSR) prepared for this hearing adopted this calculation of the offense level. Cittell has absolutely no criminal history or contacts and therefore falls within Criminal History Category I. The corresponding guideline range would be within Zone C and Cittell submits that this range would permit, and should result in, a sentence of probation.

For the reasons below, Cittell further maintains that under Guideline § 3B1.2(b) he is entitled to a two-level reduction in the offense level because he was a minor participant

---

[2] When federal agents executed a warrant to search Matthew Cittell's home in June 2005, they mistakenly believed that he was "*Keymaster*," a member of an international warez group known as RISCISO. During that search, they quickly discovered that the real *Keymaster* was Lewis, Cittell's former mentor and fellow Jehovah's Witness.

in the offense conduct; and that he is entitled to an additional two-level reduction in offense level pursuant to Guideline §2B5.3(b)(4) because the offense was <u>not</u> committed for the purposes of commercial advantage or private financial gain.

In addition, Cittell requests a downward adjustment because "the method used to calculate the infringement amount is based upon a formula or extrapolation that results in an estimated amount that may substantially exceed the actual pecuniary harm to the copyright or trademark owner."  Guidelines Manual, Application Note 4.C (effective November 1, 2007).

Based on these considerations, Cittell respectfully maintains that his offense level should be 8; and, therefore, that probation is an appropriate and reasonable sentence within the Guidelines framework.  §5B1.1(a).

Finally Cittell submits that a non-guidelines sentence of probation is also appropriate and reasonable pursuant to *United States v. Booker* and its progeny, which require a sentencing court to make an independent sentencing determination based on the factors set forth in 18 U.S.C. § 3553(a).  543 U.S. 220 (2005); see also *Gall v. United States*, ___U.S. ___, 128 S.Ct. 586 (2007); *Rita v. United States*, ___ U.S. ___, 127 S.Ct. 2456 (2007); *U.S. v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007); *U.S. v. White,* 406 F.3d 827 (7th. Cir. 2005).

## A PROBATIONARY SENTENCE IS JUSTIFIED
## WITHIN THE SENTENCING GUIDELINES

### CITTELL IS THE ONLY DEFENDANT IN THIS CASE WHO IS NOT ALLEGED TO HAVE BEEN A MEMBER OF RISCISO

The investigation and prosecution in this case was intended "to disrupt and dismantle many of the leading criminal organizations that illegally distribute and trade in copyrighted software, movies, music, and games on the Internet" -- groups that were at "the top of the copyright piracy supply chain." Department of Justice Press Release, "JUSTICE DEPARTMENT ANNOUNCES INTERNATIONALINTERNET PIRACY SWEEP: Operation Site Down' Attacks Organized Piracy Networks in 10 Countries," June 30, 2005.

As reflected in the PSR and the plea agreement, Cittell was never anywhere near the top of the copyright piracy supply chain.  He was not even a member of RISCISO. In contrast, all of the other co-defendants, including co-defendant Piecyhna, were RISCISO members.  In fact, according to the PSR, Piecyhna -- who has already received a probationary sentence -- was a "long-time member" of RISCISO.

Sentencing Guideline §2B5.3(a), which establishes the base offense level for criminal infringement of copyright or trademark, does not distinguish between the kind of unlawful activity that Cittell and the government have agreed he was guilty of, and the much more serious large scale and worldwide activities that were targeted by Operation Site Down.  Nor do any of the "specific offense characteristics" outlined in §2B5.3(b) specifically take into account the difference  between an offense committed by an

4

individual and an offense committed by the kind of organized networks targeted by

Operation Site Down.[3]  Within the framework of Guideline §2B5.3, the only factor that

can be used to distinguish these two very different types of offenses is special offense

characteristic §2B5.3(b)(1), the "infringement amount."   Because of the failure of the

guidelines to make such a distinction, Cittell submits that the initial adjusted offense level

exaggerates his culpability relative to defendants who are convicted of a conspiracy in a

case such as this and sentenced based on the same Adjusted Offense Level.

In Cittell's case, the government has attempted to recognize the limited nature of

his offense by setting the "infringement amount" at "approximately $42,000."  Cittell

does not contest that this is a reasonable estimate based on the evidence as to the items

that were downloaded to his computer.   But this amount does not fully take into account

factors that serve to lessen his culpability for purposes of sentencing.  Specifically, he

contends that even after agreement on the loss amount, he is entitled to downward

adjustments because he was a minor participant in the offense of which he has been

convicted; he did not commit the offense for purposes of commercial advantage or

private financial gain; and "the method used to calculate the infringement amount is

based upon a formula or extrapolation that results in an estimated amount that may

substantially exceed the actual pecuniary harm to the copyright or trademark owner."

---

[3] A conspiracy is often treated more seriously than a violation of the underlying offense
because of the fact that "collective criminal agreement--partnership in crime--presents a
greater potential threat to the public than individual delicts."  *Callanan v. U.S.,* 364 U.S.
587, 594 (1961); see also *U.S. v. Colon*, 549 F.3d 565, 569-570 (7th Cir. 2008).

*Minor Participant*

Sentencing Guideline §3B1.2 provides for a downward adjustment of 2 to 4 offense levels based on the defendant's role in the offense.   Cittell acknowledges that his role was more than "minimal"; and he is, therefore, not entitled to the maximum adjustment allowed under §3B1.2(a).   However, he contends that he should receive a two- level adjustment based on the fact that he was a minor participant in the criminal activity to which he pled guilty.   §3B1.2(b).

With regard to this issue, the PSR states, "[h]ad . . . [Cittell] been convicted of the conspiracy count, his offense level might have been significantly higher due to the scope of his relevant conduct and its effect on specific guideline enhancements, e.g., §2B5.3(b)(I) and/or (b)(3).   Therefore, it is the undersigned officer's assessment that no adjustment is applicable pursuant to §3B1.2(b)."   Following this logic, no defendant would ever be entitled to a minor participant downward adjustment in a case in which he or she was initially charged with both a conspiracy and a substantive offense unless he or she pled to the conspiracy.   In contrast, the government's opposition to a minor participant downward adjustment is based on the argument that the $42,000 loss amount limits Cittell's culpability to only those loses for which he was personally responsible.

In the Commentary to Guideline §3B1.2, the Sentencing Commission specifically notes that:

> [A]  defendant who is accountable under 1.3 (Relevant Conduct) only for
> the conduct in which the defendant personally was involved and who
> performs a limited function in concerted criminal activity is not precluded
> from consideration for an adjustment under this guideline.  For example, a
> defendant who is convicted of a drug trafficking offense, whose role in that

> offense was limited to transporting or storing drugs and who is accountable
> under 1.3 only for the quantity of drugs the defendant personally
> transported or stored is not precluded from consideration for an adjustment
> under this guideline.

§ 3B1.2, Application Note 3A.

The defense submits that, under the guidelines, the relevant issues are, first, whether "more than one participant was involved in the offense" for which Cittell was convicted, §3B1.2, Application Note 2, and, second, whether he is "less culpable than most other participants," §3B1.5.

In this case, there is no question that co-defendant Lewis was involved in the actual conduct to which Cittell has pled.  Moreover, as both the plea agreement and the PSR acknowledge, Lewis' culpability (i.e. role in the substantive offense) was substantially greater than Cittell's.  In fact, the only means by which Cittell committed any infringement was by using software programs configured by Lewis to download materials that could only be accessed using Lewis' password to access the RISCISO server.  Without Lewis' involvement, it would have been impossible for Cittell to have committed the offenses to which he has pled guilty.  That Lewis has pled to the broader conspiracy count and the government has estimated the loss amount that he is personally responsible for at an amount greater than $42,000 does not change the fact that Lewis was also involved in, and substantially more culpable for, the infringements that led to the $42,000 loss amount the government has attributed to Cittell.

Cittell's contention that he was substantially less culpable for the $42,000 estimated loss amount is also supported by the fact that the estimated loss amount

included the value of computer software programs which were downloaded solely for

Lewis' use.  It is important to note in this regard that the thirteen downloaded items listed

in the plea agreement are the same thirteen items mentioned in COUNT TWELVE of the

indictment which included conduct attributed to both Cittell and Lewis.  In contrast, all of

the other substantive counts in the indictment listed conduct attributed to a single co-

defendant.   Of the thirteen items contained in COUNT TWELVE, the two most

expensive--Autodesk AutoCAD v2006 ($3,470) and Autodesk AutoCAD Electrical

v2006 ($5,195)--were programs that Lewis, who was employed as an AutoCAD drafter,

had a professional specific interest in (and, in contrast, that were of no use to Cittell).

For these reasons, Cittell's participation in the offense conduct was minor and he

is entitled to a two-level downward adjustment.

*No Commercial Advantage or Private Financial Gain*

Under §2B5.3(b)(4), Cittell also maintains that he is entitled to a two-level

downward adjustment because he did not commit the offense for commercial advantage

or private financial gain.  In §2B5.3 Application Note 1, "commercial advantage or

private financial gain" is defined as "the receipt, or expectation of receipt, of anything of

value, including other protected works."

The PSR's analysis of this issue consists of the following sentence:  "It is the

undersigned officer's assessment that this reduction is inapplicable, as the works

downloaded by the defendant were protected works and things of value."  Taken literally,

this definition would mean that all violations of Section 506(a)(2) would necessarily be

for commercial advantage or financial gain since the offense requires that a defendant

copy works with a value of at least $2,500.  Such an interpretation could not have been

intended by drafters of §2B5.3(b)(4) since it would have the effect of rendering this

sentencing factor superfluous and entirely without effect in copyright cases.

For this reason, Cittell suggests that §2B5.3(b)(4) should be construed to mean

something more than that a defendant copied protected works of value.  Based on the

plain language meaning of "commercial advantage " and "private financial gain", these

words imply an intention to secure something other than a personal, nonpecuiniary

benefit.

In this case, it has not been alleged that Cittell obtained any personal benefit other

than the personal enjoyment he received from watching some of the movies he

downloaded.  He did not profit from downloading copyrighted works or, alternatively,

distribute works to others who sought to profit from their sale.  And that is clearly the

primary evil that criminal copyright prosecutions are intended to combat.  For example,

in publicizing the investigation that led to the arrest of Cittell, the Justice Department

declared,

> Top-level release groups like those targeted in the operation are primary
> suppliers to the for-profit criminal distribution networks that cost the
> copyright industry billions of dollars each year.  Illegal warez copies of
> titles such as Autocad 2006 and "Mr. and Mrs. Smith" are easily and
> cheaply converted to optical discs and distributed throughout the world
> from factories in Asia and elsewhere.

Department of Justice Press Release, "JUSTICE DEPARTMENT ANNOUNCES

INTERNATIONAL INTERNET PIRACY SWEEP: Operation Site Down' Attacks

Organized Piracy Networks in 10 Countries," June 30, 2005.

Given the facts of this case -- i.e. that there is no allegation Cittell sold or attempted to sell any of the works he downloaded--, the only way in which it could be alleged that Cittell downloaded copyrighted works for commercial advantage or financial gain is to argue that he downloaded works that he would have otherwise purchased.  For that to be the case it would be necessary to establish that he would have otherwise purchased them.  But Cittell's interest in works he downloaded was limited to movies; and there is no evidence that he would have purchased any of the movies he downloaded if he had not had access to them through Lewis.  Moreover, even if he would have otherwise purchased a small number of the movies he downloaded, the total amount of his purchases would have clearly been a very small fraction of the $42,000 loss amount.

The $42,000 loss amount boosted Cittell's offense level by six levels.  Because Cittell's motive was personal enjoyment not commercial advantage or private financial gain, a two-level adjustment is clearly consistent with and justified by §2B5.3(b)(4).

*The Estimated Infringement Amount Exceeds the Actual Pecuniary Harm to the Copyright Owner*

Finally, Cittell is entitled to a downward adjustment consistent with Guideline §2B5.4 Application Note 4.C because "the method used to calculate the infringement amount is based upon a formula or extrapolation that results in an estimated amount that may substantially exceed the actual pecuniary harm to the copyright or trademark owner."   In calculating the $42,000 loss value, Cittell believes that the government relied on the retail prices of the downloaded items.  But, as this application note clearly recognizes, the retail price does not necessarily represent "actual pecuniary harm"

suffered by the owners of the copyrights to those works.  In this case, the actual

pecuniary harm to the copyright holders was not anywhere close to $42,000.  For

example, given the fact that Cittell never used -- and, in fact, had no personal use for --

either of the AUTOCAD programs he admitted to downloading, it is inconceivable that

he would have paid thousands of dollars to purchase those programs if they had not been

downloaded by the programs Lewis installed on his computer.  Thus, the actual loss to

the owner of AUTOCAD copyright was zero.[4]

For these reasons, Cittell believes that this court should take into account the

recently added consideration in Guideline §2B5.4 Application Note 4.C and adjust his

offense level to reflect the actual pecuniary harm to the copyright owners, which Cittell

submits would have certainly not been greater than $30,000.  For this reason, a further

two-level downward adjustment of the offense level is warranted.

*Summary*

For all of the above reasons, Cittell maintains that, after taking into account the

adjustments justified under §§3B1.2, 2B5.3(b)(4) and §2B5.4 Application Note 4.C, the

correct adjusted offense level in his case should be 8 rather than 12, which would put him

in Zone A.  The most appropriate and reasonable sentence would, therefore, be probation.

---

[4] The copyright holder may have suffered a loss <u>if</u> Lewis used the downloaded AUTOCAD programs instead of purchasing them.  But there is no evidence that he did so.  Moreover, if the loss resulted from Lewis' use of the programs (rather than Cittell's use of the programs) it would merely reinforce the arguments above that Cittell was a minor participant in the offense conduct and that it was Lewis not Cittell who obtained a private financial gain from the infringement.

## A PROBATIONARY SENTENCE IS JUSTIFIED
## PURSUANT TO 18 U.S.C. § 3553(a)

Based on the individualized circumstances of his case and consideration of the relevant sentencing factors outlined in 18 U.S.C. § 3553(a), defendant Cittell also respectfully argues that probation would be reasonable and justified.

Section 3553(a) provides that a sentencing judge must "consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) "just punishment" (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Rita v. U.S.*, 551 U.S. ___, ___; (2007).

In this case, a departure from the Sentencing Guidelines is warranted under section 3553(a)(1) because of the personal characteristics that contributed substantially to Cittell's violation of the law, specifically his relatively isolated upbringing and undiagnosed OCD (Obsessive-Compulsive Disorder), and the specific circumstances of the offense, i.e. the fact that the acts Cittell committed were the induced and facilitated by co-defendant David Lewis as part of an apparent effort by Lewis to shield himself, at least partially, from discovery.

Based on the pattern of sentencing in other similar cases, a downward departure is also warranted because a custodial sentence would create an unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). Given Cittell's clear acknowledgement of responsibility for

unlawful infringement and deep remorse, the fact that he and his family have already paid

a substantial price for his unlawful actions[5], and his prospects for complete rehabilitation

if he is given probation, a probationary sentence would be more than sufficient to ensure

that Cittell did not reoffend and to deter others from committing similar offenses.  Thus, a

probationary sentence would reflect the basic aims of sentencing.

*Personal Characteristics of the Offender*

Cittell, who had <u>no</u> prior contacts with law enforcement, has clearly acknowledged

the unlawfulness of his actions and in no way seeks to excuse himself from

responsibility.  Consistent with § 3553(a)(1), however, he respectfully requests that the

court consider two personal factors that contributed to his violation of the law.

As the attached letter from his parents explains, Cittell had a relatively isolated

upbringing.  (See Exhibit One.)  He was born in 1978 and grew up as a practicing

Jehovah's Witness[6], a faith that more than most faiths tends to set a child apart from other

children.  He became even more isolated from his peers after his parents removed him

from the public school system when he was in 7th Grade and later placed him in a home

---

[5] As the PSR documents, since being charged Cittell has lost 100 pounds, his wife
Molly's health has progressively worsened due to anxiety arising from her husband's
case, and they have been placed on the brink of bankruptcy.

[6] In his parent's letter to the court, Matt's mother writes: "Matt started attending
[Jehovah's Witness] meetings when he was two weeks old.  He rang his first doorbell
when he was three years old.  In 1987, I became an auxiliary pioneer, which means
devoting 70 hours a month to my ministry.  Since, as we explain below, Matt was home
schooled, he had a lot of time on his hands and he chose to come with me most of the
time and he also became an Auxiliary pioneer.  Some months he would surpass the
amount of hours I put in.  One month, for example, I remember that he put in ninety of
what we call pioneer hours."

schooling program[7].  As a consequence, his social world was limited to his family and a

very few friends, all of whom were Jehovah's Witnesses.  Like many other isolated

youths, he gravitated to computers and the then newly emerging virtual world of the

Internet, which in turn increased his social isolation[8].  Because of his interest in

computers, Cittell was drawn to David Lewis, a fellow Jehovah's Witness and friend of

Cittell's older brother.  (See Exhibit One.)   Beginning in 1993, Lewis became Cittell's

closest friend and mentor.

In the late 1990s, after Cittell met his future wife Molly, who is also a Jehovah's

Witness, he refocused his personal attentions away from the Internet.  He and Molly

married in 2001.  In late 2002, Lewis, who by then had become an active member of

RISCISO, drew Cittell back into the world of the Internet, which had changed

substantially since the mid-1990s[9].  As he has acknowledged, Cittell was enticed in part

by Lewis' offer of access to movies, but he was also influenced by his prior relationship

of trust with Lewis.

Undiagnosed OCD also contributed to Cittell's unlawful conduct.  Before he was

arrested, as his parents' letter documents, Cittell had manifested obvious signs of OCD.

---

[7] For examples of numerous cases that illustrate the difficulties that children of Jehovah's Witnesses have experienced in public schools see http://jwdivorces.bravehost.com/school.html.

[8] See Christopher E. Sanders,  Tiffany M. Field,  Miguel Diego,  Michele Kaplan, "The Relationship Of Internet Use To Depression And Social Isolation Among Adolescents," *Adolescence*, Summer, 2000.

[9] The change most relevant to this case was the passage of the No Electronic Theft Act in 1997.  See PL 105-147 (December 16, 1997).

(See Exhibit One.) But he had not received any treatment. As documented in the PSR, Cittell's disorder was only confirmed in 2006 by both a psychologist and a psychiatrist who Cittell was referred to by Pretrial Services[10].

Cittell does not view his OCD as an excuse for his unlawful conduct. But if he had been diagnosed and treated, he would have been better able to understand the broader consequences of his actions and resist the pressures and impulses that contributed to his violation of the law. More important, the fact that he is now aware of his disorder and its effects (and has received treatment) will help to ensure his rehabilitation. As documented in the professional literature, OCD can substantially impair a sufferer's judgment and ability to control his impulses[11]. Cittell's OCD reinforced his social isolation, caused him to be drawn to computers and the Internet, and may have increased his susceptibility to the influence of a trusted mentor.

*Specific Characteristics of the Offense*

As explained above, Cittell would not have committed his offense but for his relationship with David Lewis. He recognizes that this does not diminish his responsibility for his personal acts. But Lewis' involvement was a substantial characteristic of the offense for which Cittell is being convicted. As noted above,

---

[10] It is important to note that Cittell was diagnosed by experts appointed by the government and more than a year before he retained his current counsel. This is, therefore, clearly not a case in which a defendant sought a medical diagnosis in order to obtain a lesser sentence.

[11] For a comprehensive description of OCD symptoms see http://www.mayoclinic.com/health/obsessive-compulsive-disorder /DS00189/DSECTION=symptoms.

COUNT TWELVE of the indictment did not distinguish between infringing acts committed by Lewis and those committed by Cittell.  Without Lewis' involvement, Cittell would have lacked the means to commit the offense.  Throughout the proceedings surrounding plea and sentencing, the government has forthrightly acknowledged that Cittell's acts were the result of Lewis' encouragement and persuasion; and it has acknowledged that it was Lewis not Cittell who was responsible for configuring the software and connections that made it possible to download infringing items to Cittell's home computer.  It is also significant that Lewis, who may have previously come under suspicion of violating copyright laws, appears to have involved Cittell at least in part to shield himself from discovery.   Moreover, the fact that investigating agents initially believed that Cittell was *Keymaster* and only discovered their error after they executed a warrant to search Cittell's home suggests that Lewis did at least partially succeed in using Cittell to shield himself from discovery.  Finally, as explained above, the highest value items that Cittell and Lewis downloaded were items that were of personal interest to Lewis <u>not</u> Cittell.  For all of these reasons, Cittell respectfully argues that the specific characteristics of his offense justify a downward departure from the sentencing guidelines.

*A Custodial Sentence Would Create an Unwarranted Sentence Disparity*

Based on the pattern of sentencing in other similar cases, a custodial sentence in Cittell's case would create an unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In other cases arising out of the government's investigation of warez groups, sentencing courts

have given probationary sentences to a substantial number of defendants who were convicted based on unlawful conduct that was more serious than the conduct that Cittell has been convicted of.

In *U.S.A. v. Robert Hardick,* defendant Robert Hardick  received a probationary sentence and six months home confinement.  (U.S. District Court for Connecticut, Case #08-83, Document #46, Filed 09/04/2008.)  The defendant pled guilty to conspiracy to commit copyright infringement.  (Id., Document #21, Filed 05/14/2008.)  Based on a 14 point upward adjustment for a loss amount that exceeded $400,000 and a 2 point upward adjustment for uploading,  the defendant's Total Offense Level was set at 24 and, based on a 3 point downward departure for acceptance of responsibility, the Adjusted Offense Level was set at 21.  (Id., Document #21, Filed 05/14/2008; Document 45, Filed 08/28/2008.)  In arguing for a probationary sentence, the defendant emphasized his acceptance of responsibility, efforts to atone for his violation of the law, that he made no money as a result of his involvement in the scheme, that he was not a "hacker" or involved in distributing "malicious code," that he was a dedicated family man,  that he had overcome an alcohol addiction problem, that incarceration would punish his innocent wife and two daughters, that he would not be a repeat offender, and probation was a punishment.  (Id., Document  #21, Filed 05/14/2008.)

In *U.S.A. v. Ali Ghani,* defendant Ali Ghani received a probationary sentence and eight months home confinement.  (U.S. District Court for the Northern District of California, Case #06--00054, Document 365, Filed 05/09/2008.)  The defendant pled guilty to both a conspiracy count and an infringement count.  The parties stipulated to an

Adjusted Offense Level of 15 based on a 8 point upward adjustment for a loss amount of not more than $120,000, a 2 point upward adjustment for uploading, and a 3 point downward adjustment for acceptance of responsibility; and the government recommended a eighteen month prison sentence.  (Id., Documents 349, Filed 03/28/2008; 321, Filed 08/20/2007.)  Initially the defendant argued that the loss amount should have been roughly $7,000, but he later stipulated to the 8 point upward adjustment for a loss amount of not more than $120,000.  In support of his plea for probation, he cited his cooperation with the government and his role as the sole caretaker of his mother who was ill with cancer.  (Id., Document 343 Filed 03/04/2008.)

In *U.S.A. v. Matthew Fong*, defendant Matthew Fong received a probationary sentence and ten months home confinement.  (U.S. District Court for the Northern District of California, Case #06--00054, Document 257 Filed 11/02/2006.)  The defendant pled guilty to three counts: a conspiracy count and two infringement counts.  In its sentencing memorandum, the government stated that the defendant was "a significant co-conspirator."  (Id., Document 239, Filed 10/10/2006.)  Despite this, the government agreed that Adjusted Offense Level was 12 based on a 4 point upward adjustment for a loss amount of not more than $30,000, a 2 point upward adjustment for uploading, and a 2 point downward adjustment for acceptance of responsibility; and the government recommended a ten month prison sentence.  (Id.)  In arguing for a probationary sentence, the specific factors defendant cited to support a downward departure were his young age, his bright academic and occupational future, his genuine expressions of remorse and early acceptance of responsibility, lack of prior criminal history, low propensity for any

future criminal behavior, and co-defendant and related case defendant sentences.  (Id.,
Document 245 Filed 10/16/2006.)

In *U.S.A. v. Matthew Thompson,* defendant Matthew Thompson received a
probationary sentence and eight months home confinement.  (U.S. District Court for the
Northern District of California, Case #06--00054, Document 237, Filed 10/10/2006.)
The defendant pled guilty to both a conspiracy count and an infringement count and
acknowledged uploading materials.  The PSR calculated that the Adjusted Offense Level
was 12 based on a 4 point upward adjustment for a loss amount of slightly over $22,000,
a 2 point upward adjustment for uploading, and a 2 point downward adjustment for
acceptance of responsibility; and the government recommended a ten month prison
sentence.  (Id., Document 223, Filed 09/18/2006.)  In arguing for a probationary
sentence, the specific factors defendant cited to support a downward departure were his
lack of criminal history, immediate acceptance of responsibility, his lack of risk for future
criminal conduct, and sentences of co-defendants. (Id., Document 225, Filed 09/20/2006.)

In *U.S.A. v. Mark Repp,* defendant Mark Repp received a probationary sentence
and up to one hundred and eighty days home confinement.  (U.S. District Court for the
Eastern District of Wisconsin, Case #06-178, Document 12, Filed 12/08/2006.)  The
defendant pled guilty to both a conspiracy count and an infringement count and
acknowledged uploading materials.  The PSR calculated that the Adjusted Offense Level
was 12 based on a 4 point upward adjustment for a loss amount between $10,000 and
$30,000, a 2 point upward adjustment for uploading, and a 2 point downward adjustment
for acceptance of responsibility; and the government recommended a ten month prison

sentence.  (Id., Document 2, Filed 07/24/2006.)  According to the plea agreement,

defendant monitored the communications of ET members and had authority to exclude

ET members from the network, introduced copyrighted works onto the ET network for

others to download, and obtained copyrighted works and provided them to others to

upload onto the ET network.  (Id.)  In granting a probationary sentence, the court found:

> Given the non-violent nature of the offense, defendant's lack of any prior record and his young age [eighteen years old], I saw no need for confinement in prison to protect the public or deter defendant from re-offending. Defendant seemed genuinely remorseful, and this process had a profound impact on him. I concluded that a period of home confinement as a substitute for imprisonment would sufficiently punish defendant, promote respect for law and deter others.

The court also cited as factors in sentencing that:

> Defendant was barely eighteen years old when he started committing this crime, hardly an adult, and lived what appeared to be a relatively sheltered life. He also suffered from severe anxiety, and I concluded that the stress of a confined situation may well be more than he could safely bear. With no need to protect the public, community confinement was the better choice.

(Id., Document 11, Filed 12/08/2006.)

In this case, Greg Piecyhna, the only defendant to be sentenced so far, received a

probationary sentence.  Although the loss amount attributed solely to Piecyhna was only

$17,000, the PSR characterizes him as a "long-time member" of RISCISO.

*Summary*

Based on Cittell's unique personal characteristics, the specific circumstances of his

offense, and the sentences that have been to other defendants in cases involving Internet

copyright infringement, a probationary sentence is both justified and reasonable in this case.

Cittell has acknowledged that he violated the law. It is beyond dispute that he made a serious misjudgment. But his case clearly does not fall within the heartland of cases that Congress intended the laws prohibiting criminal copyright infringement to deter and punish through incarceration. Given his OCD and the hardships that his wife would suffer as a result of his incarceration for even a short period, a prison sentence would be a harsh punishment. A probationary sentence would allow Cittell to begin to regain the life he lost as a result of his misjudgment and violation of the law.

Since he was arraigned nearly three years ago, Cittell has been on what has already amounted to a lengthy probationary sentence. During that period he has complied completely with all of the requirements of the terms of his pretrial release without incident; and he has met regularly with court appointed psychologists to help to address his OCD. Based on that experience, there is a clear basis for this court to find that Cittell's prospects for rehabilitation are extremely good, especially if the terms of probation allow him to retain the job that he has had for over seven years. Moreover, incarceration would add little to the deterrent effect that the punishments Cittell has already experienced will have on others. Both he and his wife have paid an extremely heavy emotional, physical, and financial fine for Cittell's violation of the law.

For all of the reasons above, and especially taking into account the unique factors that contributed to Cittell's misjudgments and the specific characteristics of his role in the offenses that the government has targeted in this case, the objectives of Section 3553(a)

and the interests of justice would be best served by a probationary sentence with a

condition of community service.

DATED: January 16, 2009

Respectfully submitted,

Martin Sabelli
Law Offices of Martin Sabelli
 500 Liberty St.
San Francisco CA 94114
Telephone: (415) 298-8435
piropo@msn.com
[*Attorney for Matthew Cittell*]

_____/s/ Michael Clough_____
Michael Clough
Law Offices of Michael Clough
6114 LaSalle Ave #833
Piedmont CA 94611
Telephone: 650-274-7764
mwclough@gmail.com
[*Attorney for Matthew Cittell*]